ESTATE OF Jacquelyn SCOTT, by David F. SCOTT, Personal Representative, Plaintiff,

v.

Richard deLEON, Michael Minerath, William Thayer, and Walter Scott, Defendants,

and

Walter V. SCOTT, Third-Party Plaintiff, and Cross-Plaintiff and Defendant,

v.

Ann Marie PIZZUTI, Staff Pharmacist; David F. Scott; Harold T. Shapiro, President, University of Michigan; Gary Calhoun, Assistant Director of University of Michigan Hospital; and Michael Ryan, Assistant Director of Pharmacy, Jointly and Severally, Third-Party Defendants,

and

Richard deLeon, Director of Pharmacy; Michael Minerath, Associate Director of Pharmacy, and William Thayer, Assistant Director of Pharmacy, Jointly and Severally, Cross-Defendants and Defendants.

Civ. No. 82–60399.

United States District Court, E.D. Michigan, S.D., Ann Arbor Unit.

March 13, 1985.

Donald E. Shelton, Allen J. Philbrick, Ann Arbor, Mich., for David F. Scott.

Robert M. Vercruysse, Gregory V. Murray, Butzel, Long, Gust, Klein & Van Zile, Detroit, Mich., for Richard deLeon, Michael Minerath, William Thayer, Ann Marie Pizzuti, Harold T. Shapiro, Gary Calhoun, and Michael Ryan.

Raymond F. Clevenger, Ann Arbor, Mich., Elmer L. Roller, Detroit, Mich., Roger F. Wardle, Cynthia Cooper Adkison, Farmington Hills, Mich., Paul Van Oostenburg, Grand Rapids, Mich., for Walter V. Scott.

## OPINION

FEIKENS, Chief Judge.

This is a civil rights action filed by the personal representative of Jacquelyn Scott's estate ("plaintiff"), alleging that Mrs. Scott's death resulted from the sexual harassment of defendant Walter Scott. In addition to plaintiff's claims against Walter Scott, plaintiff has sued three of Walter Scott's supervisors, alleging that their knowing and reckless disregard of his harassment of the deceased denied her equal protection of the law and is actionable under 42 U.S.C. § 1983. I now consider the supervisory defendants' argument that they are protected against this claim by their qualified immunity, *see Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), and are entitled to summary judgment. I conclude that the motion for summary judgment should be denied.

## I. FACTS

A motion for summary judgment can be granted only when a court "finds from the whole record before it that there are no material facts which are in dispute. It may not make findings of disputed facts on a motion for summary judgment." *Watkins v. Northwestern Ohio Tractor Pullers Association*, 630 F.2d 1155, 1158 (6th Cir. 1980). The burden is on the moving party to show "conclusively that there exists no genuine issue as to a material fact and the evidence together with all inferences to be drawn therefrom must be considered in the light most favorable to the party opposing the motion. The movant's papers are to be closely scrutinized while those of the opponent are to be viewed indulgently." 630 F.2d at 1158.

With these standards in mind, I will briefly recite the facts that might be inferred from the record before me when it is viewed most favorably for plaintiff. In doing so, I emphasize that my discussion does not constitute actual, or even tentative, factual findings by the Court. It is only intended to elucidate the facts that might be inferred from the record so that I can determine whether on these facts defendants are entitled to immunity as a matter of law.[1]

From 1977 until her death, Jacquelyn Scott was employed as a pharmacy assistant at the Mott Hospital pharmacy, which is part of the University of Michigan Hospitals. There is evidence in the record supporting the conclusion that Mrs. Scott was sexually harassed by her supervisor, Walter Scott, from late 1978 until approximately September, 1981 (when Walter Scott went on sick leave). This harassment included sending her numerous letters and notes at work, attempting to rearrange her working hours, and threatening her not to transfer out of the pharmacy, in an effort to coerce her into having a sexual relationship with him.

In August, 1979, while Walter Scott was on vacation, Jacquelyn Scott complained to defendant Thayer of this harassment. Thayer was Assistant Director of Pharmacies at University of Michigan Hospitals and was the immediate supervisor of Walter Scott. There is evidence indicating that Thayer met with Walter Scott and told him that as long as his behavior did not interfere with his work, Thayer would not pursue the matter. Deposition of Walter Scott, p. 80. A later meeting between Jacquelyn Scott, Walter Scott, and Thayer was cancelled after Jacquelyn Scott did not show up and Walter Scott told Thayer that she had changed her mind. Thayer claims that Jacquelyn Scott told him in September, 1979, that the harassment had stopped.

Although the harassment apparently did stop for some time, it began again in early 1980. There is evidence suggesting that this was common knowledge at the pharmacy and it might be inferred that Thayer must have been aware of it. Nevertheless, plaintiff alleges that Thayer made no further investigation nor took any other action, and further that he made no notation of the harassment in Walter Scott's personnel file. When Thayer was replaced by defendant Minerath in September, 1980, Thayer did not inform him of the problem.

Jacquelyn Scott complained of the harassment to Minerath in September, 1981, while Walter Scott was again on vacation, and requested a transfer. There is some evidence suggesting that Minerath may have waited one month before acting on this complaint, and that he then contacted the personnel department. He informed Jacquelyn Scott that she would have to meet with the personnel department and provide documentary evidence of her claim. There is also evidence suggesting that his conduct was contrary to University policy requiring supervisors to "[i]nvestigate [an] allegation of harassment and if misconduct has occurred, take immediate disciplinary action up to and including discharge. Fail-

1. In reviewing the extensive record before me, I have given no credence to statements that would be inadmissible hearsay evidence at trial.

ure to do so is also misconduct subject to disciplinary action." Plaintiff's Exhibit 7 (University of Michigan Standard Practice Guide).

· Plaintiff alleges that in November, 1981, Jacquelyn Scott complained to defendant deLeon, the Pharmacy Director for the University of Michigan Hospitals, and requested a transfer. deLeon contacted Minerath who told him that nothing could be done unless someone filed a formal complaint with the personnel department. Plaintiff alleges that deLeon did not transfer Jacquelyn Scott and took no further action.[2] On November 26, 1981, Jacquelyn Scott died, apparently as a result of a drug overdose.

In reciting these facts, I reiterate that this version is simply what might be inferred from the record when considered in the light most favorable to plaintiff. While defendants vigorously dispute this account, I must, for purposes of this motion, assume it to be true and determine whether the alleged conduct is actionable under 42 U.S.C. § 1983.

## II. DISCUSSION

In *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the Supreme Court held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." 457 U.S. at 818, 102 S.Ct. at 2738.[3] In articulating a test that focuses on "the objective reasonableness of an official's conduct, as measured by reference to clearly established law," the Court sought to "avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment." 457 U.S. at 818, 102 S.Ct. at 2739. In considering whether the supervisory defendants are immune in this action, I have heeded the Court's frequent admonitions that "insubstantial claims should not proceed to trial," *Harlow*, 457 U.S. at 815–16, 102 S.Ct. at 2737, 73 L.Ed. 396, *see also Butz v. Economou*, 438 U.S. 478, 507–08, 98 S.Ct. 2894, 2911–12, 57 L.Ed.2d 895 (1976), and have reviewed the record and applicable law with great care.[4]

■ Summary judgment is warranted in this case unless it was clearly established as of late 1979[5] that the supervisory defendants' conduct was actionable in a section 1983 action based on the equal protection clause. That defendants' conduct may have clearly violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e–17 (1982) ("Title VII"), does not strip them of immunity in a suit such as this, which is based on the equal protection clause and not Title VII.[6]

**2.** Although deLeon claims that Jacquelyn Scott withdrew the transfer request, there is evidence in the record that clearly creates a genuine issue as to this fact.

**3.** *See also Hall v. Medical College*, 742 F.2d 299, 307–10 (6th Cir.1984), *cert. denied*, 105 S.Ct. 796 (1985); *People of Three Mile Island v. Nuclear Regulatory Commissioners*, 747 F.2d 139, 143–45 (3d Cir.1984). *See generally* Note, Harlow v. Fitzgerald: *The Lower Courts Implement the New Standard for Qualified Immunity Under Section 1983*, 132 U.PA.L.REV. 901 (1984).

**4.** In moving for summary judgment on this ground, defendants originally focused on Title VII cases in their discussion of whether their conduct violated clearly established law. The Court requested rebriefing on whether immunity was only lost if it was clearly established that defendants' conduct was actionable in a § 1983 claim based on the equal protection clause and,

if so, whether it was clearly established that supervisors could be held liable in such an action. After rebriefing, the matter was discussed at length in oral argument before the Court.

**5.** I have used late 1979 as the benchmark date because this is the earliest date on which any of these defendants is alleged to have acted in an actionable manner. While their subsequent conduct might also justify use of a later date, my decision that the relevant law was clearly established by late 1979 renders this possibility moot.

**6.** In *Davis v. Scherer*, —— U.S. ——, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984), the Court indicated that government officials do not "lose their immunity by violating the clear command of a statute or regulation—of federal or of state law—unless that statute or regulation provides the basis for the cause of action sued upon." 104 S.Ct. at 3020 n. 12.

By 1979, it was clearly established that the equal protection clause prohibited intentional gender discrimination unless it was substantially related to a legitimate government objective. *See Craig v. Boren,* 429 U.S. 190, 197, 97 S.Ct. 451, 456, 50 L.Ed.2d 397 (1976).[7] It was equally clear that a single · invidiously discriminatory governmental act "would not necessarily be immunized by the absence of such discrimination in the making of other comparable decisions." *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 266, 97 S.Ct. 555, 564 n. 14, 50 L.Ed.2d 450 (1977). *See also Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 152, 90 S.Ct. 1598, 1605, 26 L.Ed.2d 142 (1970).

■ I have little difficulty concluding from these principles that it was clearly established that sexual harassment could violate the rights protected by the equal protection clause. Although no case had considered this issue, common sense as well as relevant Title VII case law indicated that harassment was the sort of invidious gender discrimination that the equal protection clause forbade: that is, intentional discrimination against a woman because of her sex by a person acting under color of law. Plaintiff alleges that it was the very essence of Jacquelyn Scott's womanhood that motivated Walter Scott. As Walter Scott acknowledges, he "was attracted to her *as a woman,* on a personal basis. Her *'femaleness'* was a matter of

attraction." Brief in Support of Third Party Plaintiff, Cross-Plaintiff and Defendant, Walter Scott's Motion for Summary Judgment, p. 16 (emphasis added). Further Title VII case law indicated that sexual harassment could be motivated by the victim's gender. As the United States Court of Appeals for the District of Columbia Circuit explained in *Barnes v. Costle,* 561 F.2d 983, 990 (D.C.Cir.1977):

> But for [plaintiff's] womanhood, from aught that appears, her participation in sexual activity would never have been solicited.... [S]he was invited only because she was a woman subordinate to the inviter in the hierarchy of agency personnel. Put another way, she became the target of her superior's sexual desires because she was a woman, and was asked to bow to his demands as the price for holding her job. The circumstance imparting high visibility to the role of gender in the affair is that no male employee was susceptible to such an approach by [plaintiff's] supervisor.[8]

The same analysis pertains to the allegations in this case. For these reasons, I conclude that it was clearly established by 1979 that the alleged gender discrimination violated the equal protection clause.

■ The more difficult question before me is whether defendants' alleged conduct had a sufficient nexus to the harassment to make it clearly actionable under 42 U.S.C. § 1983. Section 1983 provides that

7. *Accord Personnel Administrator v. Feeney,* 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979); *Davis v. Passman,* 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979); *Califano v. Webster,* 430 U.S. 313, 97 S.Ct. 1192, 51 L.Ed.2d 360 (1977); *Frontiero v. Richardson,* 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973); *Reed v. Reed,* 404 U.S. 71, 92 S.Ct. 1, 30 L.Ed.2d 225 (1971). ·

8. Similarly, in *Tomkins v. Public Service Electric & Gas Co.,* 568 F.2d 1044 (3d Cir.1977), the Third Circuit had little trouble disposing of the suggestion that harassment was not sex-based discrimination, reasoning that "the essence of [plaintiff's] claim is that her status as a female was the motivating factor in the supervisor's conditioning her continued employment on compliance with his sexual demands." 568 F.2d at 1047.

In pointing to Title VII cases, I am well aware of the differences between Title VII actions and § 1983 equal protection actions that were recognized by 1979. In particular, the latter actions required class-based animus while an adverse impact on the class was sufficient in a Title VII action. Hence, the fact that sexual harassment was clearly recognized as "gender based" discrimination under Title VII would not, standing alone, indicate that it was clearly cognizable in a § 1983 equal protection action. The cases I have focused on are those which consider whether sexual harassment might be motivated by the victim's gender. Although some early District Court cases implied that the answer was no, this view was clearly discredited by 1979. *See* A. LARSON, 1 EMPLOYMENT DISCRIMINATION § 41.62 (1984).

"[e]very person who, under color of [law] subjects, or causes to be subjected any ... person within the jurisdiction [of the United States] to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law [or] suit in equity...." 42 U.S.C. § 1983 (1982). Plaintiff argues that defendants are liable under § 1983 because they knowingly acquiesced in, or deliberately disregarded, Walter Scott's sexual harassment.

I agree with plaintiff that the record before me creates a genuine issue as to whether defendants knowingly acquiesced in, or deliberately disregarded, Walter Scott's alleged sexual harassment. Each defendant is alleged to have been aware of the harassment and to have failed to take prompt and reasonable steps to protect the rights of Jacquelyn Scott. Whether their conduct was so inadequate under the circumstances that it constituted acquiescence in, or deliberate disregard of, the alleged harassment can only be determined properly after the evidence is fully presented at trial.

While there is a genuine factual issue as to whether defendants' conduct can be characterized as "knowing acquiescence" or "deliberate disregard," I must determine whether it was clearly established that such behavior was actionable under section 1983. The Supreme Court had not addressed this issue at the time of the alleged acts. In *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), the Court did reject the suggestion that officials were liable under section 1983 for their failure to act in the face of a statistical showing of unconstitutional behavior by police officers even without a showing of direct responsibility for the actions of those officers. 423 U.S. at 375–76, 96 S.Ct. at 606–07. The Court, however, did not consider whether a supervisor might be liable for inadequately responding to a specific complaint of unconstitutional behavior by a subordinate.[9]

Nor was definitive guidance provided by case law in the Sixth Circuit. In *Hays v. Jefferson County,* 668 F.2d 869, 874 (6th Cir.), *cert. denied,* 459 U.S. 833, 103 S.Ct. 75, 74 L.Ed.2d 73 (1982), the United States Court of Appeals for the Sixth Circuit indicated that "[knowing acquiescence] in the unconstitutional conduct of the offending officers" was actionable under section 1983, but this decision postdated the conduct in this case. The most pertinent decision during the relevant time span is *Coffy v. Multi-County Narcotics Bureau,* 600 F.2d 570 (6th Cir.1979). Although there is language in that opinion suggesting that section 1983 liability must be predicated on a supervisor's participation in, or encouragement or direction of illegal acts, *Coffy* left open the possibility that knowing acquiescence by a supervisor might be actionable:

> Neither have Coffy and Bower made out a case for nonfeasance on the part of Laird. While Laird was the Director of the Bureau, nothing in this record indicated that Laird was put on notice of an alleged scheme to put Coffy and Bower out of business that he should have prevented.

600 F.2d at 580.

Finding Supreme Court and Sixth Circuit jurisprudence inconclusive, I turn to case law in other Circuits to determine whether the law was clearly established. A review of the case law reveals that by 1979 at least thirteen cases had indicated that a supervisor's knowing acquiescence in, or deliberate indifference to, a subordinate's constitutional violation was actionable under section 1983.[10] Moreover, defendants have not brought to my attention a single case directly addressing this issue that

---

**9.** In *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), the Court held that state officials violated the Eighth Amendment if they acted with deliberate indifference to serious medical needs of prisoners, and this was actionable under § 1983. In *Estelle,* however, the indifference *itself* constituted a constitutional violation and hence obviously fell within the scope of § 1983. The question before me is somewhat different: whether acquiescence in, or indifference to, *another's* constitutional violation is actionable under § 1983.

**10.** *See Triplett v. Azordegan,* 570 F.2d 819, 823 (8th Cir.1978) ("A defendant will not be held liable under ... § 1983 unless he was personal-

reached a contrary holding and was still good law in 1979.[11]

■ In light of this overwhelming consensus in the case law, I conclude that it was clearly established that a supervisor who knowingly acquiesced in a subordinate's constitutional violations could be sued under section 1983. I reject defendants' implicit suggestion that a reasonable supervisor, confronted with a complaint of a subordinate's clearly unconstitutional conduct, could conclude that he could acquiesce in this conduct without any personal liability.

### III. CONCLUSION

Without deciding the merits of plaintiff's allegations, I conclude that there is a genuine factual issue as to whether the supervisory defendants violated clearly established law. Accordingly, defendants' motion for summary judgment based on their qualified immunity is DENIED.

---

ly involved ... or he either has or is charged with having actual knowledge that his subordinates are causing deprivations of constitutional rights"); *Sims v. Adams,* 537 F.2d 829, 832 (5th Cir.1976) ("We have also indicated ... that a complaint alleging that a police supervisor has notice of past culpable conduct of his subordinates and has failed to prevent a recurrence of such misconduct states a § 1983 claim"); *Kite v. Kelley,* 546 F.2d 334, 337 (10th Cir.1976) ("The 'affirmative link' requirement of *Rizzo* means to us that before a superior may be held for acts of an inferior, the superior, expressly or otherwise, must have participated or acquiesced in the constitutional deprivations of which complaint is made"); *Doores v. McNamara,* 476 F.Supp. 987, 992 (W.D.Mo.1979) ("[I]mposition of liability on supervisory personnel ... may also be premised on their directing the action to be taken, or acquiescing with knowledge in its commission"); *Donaldson v. Hovanec,* 473 F.Supp. 602, 608 (E.D.Pa.1979) ("An official who knows of an incident and fails to take steps to prevent a recurrence can be found to be liable under § 1983"); *Lee v. Downs,* 470 F.Supp. 188, 191 (E.D.Va.1979) ("Actions of a subordinate can be imposed on higher officials only when the superior had knowledge or acquiesced in the allegedly unconstitutional acts"), *aff'd,* 641 F.2d 1117 (4th Cir.1981); *Leite v. City of Providence,* 463 F.Supp. 585, 590 (D.R.I.1978) (A supervisory official can be found liable under § 1983 when he "failed to act or acted inadequately when he had actual or imputed knowledge of a past pattern of police misconduct or knowledge of well-known, isolated incidents of police misconduct"); *Craig v. Carson,* 449 F.Supp. 385, 396 (M.D.Fla.1978) ("[W]here, despite a defendant's knowledge of the unconstitutional conduct of his subordinates, he fails to restrain, acquiesces in, or ratifies it, and it deprives a person of his constitutional rights, the defendant will be vicariously liable"), *Duckett v. Ward,* 458 F.Supp. 624, 627 (S.D.N.Y.1978) ("[W]here a prison official is 'aware' of the unconstitutional activities of those subject to his authority, the ultimate responsibility for permitting these actions is squarely his"); *Perry v. Elrod,* 436 F.Supp. 299, 303 (N.D.Ill.1977) ("Thus, if a supervisory official is deliberately or recklessly indifferent to constitutional violations by his subordinates, or others under his control, his indifference is actionable"); *Delaney v. Dias,* 415 F.Supp. 1351, 1354 (D.Mass.1976) (For a public official to be liable under § 1983 on a theory of personal misfeasance, "there must be an allegation of, at least, some participation or acquiescence—express or otherwise—in the constitutional deprivations complained of"); *Smith v. Wickline,* 396 F.Supp. 555, 563 (W.D.Okl.1975) ("[R]esponsibility may be imposed if the official knew of past culpable conduct on the part of a subordinate and failed to take appropriate steps to prevent a recurrence"); *Potts v. Wright,* 357 F.Supp. 215, 218 (E.D.Pa.1973) ([D]efendant is not liable under § 1983 unless he "was personally involved in causing the deprivation of a constitutional right or he either has or is charged with having actual knowledge that his subordinates are causing deprivations of constitutional rights, and he is negligent in failing to take action to prevent the deprivations").

11. The cases cited by defendants did not involve knowing acquiescence by supervisors. *See* Defendant's Supplemental Brief in Support of Motion for Summary Judgment, pp. 5–6. Insofar as *Lodermeier v. City of Sioux Falls,* 458 F.Supp. 1202, 1205–06 (D.S.D.1978), rejects liability based on knowing acquiescence, it is inconsistent with the controlling Eighth Circuit decision in *Triplett v. Azordegan,* 570 F.2d 819, 823 (8th Cir.1978).